UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

SEDNEY DELANO,

                          Plaintiff,

          v.                                              9:13-CV-00070
                                                         (NAM/TWD)

R. RENDLE, et al.,

                          Defendants.

APPEARANCES:                              OF COUNSEL:

SEDNEY DELANO
Plaintiff, *pro se*
c/o Delamo Sedney
2402 Bayswater Avenue
Far Rockaway, New York 11691

HON. ERIC T. SCHNEIDERMAN              COLLEEN D. GALLIGAN, ESQ.
Attorney General for the State of New York
Attorney for Defendants
The Capitol
Albany, New York 12223


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

### ORDER AND REPORT-RECOMMENDATION

## I.    INTRODUCTION

        Pro se Plaintiff Sedney Delano has commenced this civil rights action under 42 U.S.C.

§ 1983 for violation of his rights under the Eighth and Fourteenth Amendments to the

Constitution, arising out of an incident of excessive force alleged to have occurred on January 21,

2010, while he was incarcerated in the Clinton Correctional Facility ("Clinton"), and the injuries

he sustained.[1] (*See generally* Dkt. No. 6.) The named Defendants remaining after initial review

of Plaintiff's Amended Complaint under 28 U.S.C. 1915A were Sergeant R. Rendle ("Rendle"),

Corrections Office C. Strong ("Strong"), Corrections Officer J. Mailloux ("Mailloux"), Nurse

Taylor ("Taylor"), Nurse Administrator Lecuyer ("Lecuyer"), and Douglas B. Collyer

("Collyer"). (Dkt. No. 13 at 17-18.[2]) The action was subsequently dismissed with prejudice as

against Collyer on prosecutorial immunity grounds. (Dkt. No. 98.)

Defendants Rendle, Strong, Mailloux, Taylor and Lecuyer have now moved for partial

summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 129.)

Defendants summary judgment motion is limited to Plaintiff's (1) § 1983 claims for money

damages against all Defendants in their official capacities; (2) Eighth Amendment claim for

failure to intervene to protect Plaintiff from excessive force alleged against Mailloux; (3) Eighth

Amendment claims for indifference to Plaintiff's serious medical needs alleged against

Defendants Rendle, Strong, and Taylor; and (4) a Fourteenth Amendment violation of Plaintiff's

right to privacy claim against Lecuyer.[3] *Id*. Defendants are not seeking summary judgment on

---

[1] According to New York Department of Corrections and Community Supervision Inmate Lookup records, Plaintiff was released to U.S. Immigration on conditional parole for deportation only on June 3, 2015. *See* http://nysdoccslookup.doccs.ny.gov/GCA00P00/WINQ120 (last visited July 11, 2016). The docket maintained in this case by the Northern District of New York Clerk's Office indicates that Plaintiff now resides in Paramaribo, Suriname, South America. (Dkt. No. 122.)

[2] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

[3] Upon initial review, the Hon. Norman A. Mordue, Senior District Judge, did not construe Plaintiff's Amended Complaint as asserting either an equal protection or state law assault claim. (Dkt. No. 13 at 5.) Out of what appears to be an abundance of caution, Defendants have identified paragraph 51 of Plaintiff's amended complaint as having alleged those claims and seek summary judgment dismissing them. (Dkt. No. 129-2 at 19-20.) Plaintiff

Plaintiff's Eighth Amendment excessive force claim against Defendants Rendle and Strong.[4]  *Id*.

Plaintiff has opposed Defendants' motion and cross-moved for summary judgment on all of his claims, including his claims for excessive force against Strong and Rendle.  (Dkt. Nos. 131, 136-137, 145.)  Defendants have opposed Plaintiff's cross-motion.  (Dkt. No. 139.)  For reasons explained below, the Court recommends that Defendants' motion for partial summary judgment be granted in part and denied in part, and that Plaintiff's cross-motion for summary judgment be denied.

## II.     FACTUAL BACKGROUND

### A.     Incident in the North Yard and the Pat Frisk

On January 21, 2010, while Plaintiff was incarcerated at Clinton, Defendant Mailloux approached him in the north yard, told him to put his hands behind his back, and escorted him out of the yard into an empty commissary room.  (Dkt. No. 129-4 at 3.)  According to Mailloux, while on duty in the north yard, he was told by Wall Tower 10 that Plaintiff was acting suspiciously.  (Dkt. No. 129-18 at ¶ 5.)  When Mailloux approached Plaintiff, he observed him drop a clear bag and step on it.  *Id*.  As Plaintiff attempted to walk away, Mailloux recovered a bag with a green substance later determined to be 9 grams of marijuana.  *Id*.  Mailloux claims to have escorted Plaintiff to the north yard door, placed him in mechanical restraints, and turned

---

does not appear to have addressed either claim in his submissions.  (*See* Dkt. Nos.  131-2, 131-30, 145.)  In keeping with Judge Mordue's construction of Plaintiff's Amended Complaint on initial review, the Court finds that claims for denial of equal protection and state law assault are not a part of the review in this lawsuit.

[4]  In his Amended Complaint, Plaintiff alleged excessive force by Rendle, Strong, Mailloux, and as yet unidentified John Does 1 and 2.  (Dkt. No. 6 at ¶ 2.)  Plaintiff's Eighth Amendment excessive force claims against Rendle, Strong, and John Does 1 and 2 survived initial review of the pleading.  (Dkt. No. 13 at 7-8.)

him over to the escort staff.  *Id.* at ¶ 6; *see also* Dkt. Nos. 129-5 at 1; 129-19 at 1.

Plaintiff contends that Mailloux and Strong escorted him from the north yard to the commissary room where Mailloux pat frisked him without incident.  (Dkt. Nos. 6 at ¶¶ 23-24; 129-4 at 3-4; 129-26 at 1;131-32 at 14.)  Mailloux denies pat frisking Plaintiff.  (Dkt. Nos. 129-18 at ¶¶ 7, 13; 131-22 at 2.)  According to Plaintiff, Strong called Rendle, and when Rendle arrived at the commissary, he told Mailloux and Strong to use a hand held metal scanner to search Plaintiff.  (Dkt. No. 129-4 at 3.)  Strong then told Mailloux to handcuff Plaintiff, and Mailloux, Strong, and Rendle escorted him to the facility emergency room.  (Dkt. Nos. 6 at ¶ 27; 129-4 at 3.)

### B.    Strip Frisk, Alleged Assault, and Failure to Intervene

After Plaintiff was escorted to the emergency room, he was told by Strong to face the wall in the corner of an exam room.  (Dkt. Nos. 6 at ¶ 28; 129-4 at 4.)  According to Plaintiff, Mailloux, Rendle, and other officers were also present in the room and were standing behind Plaintiff.  *Id.*  Strong ordered Plaintiff to take off his clothing one item at a time and hand the items to him and to place his hands high on the wall after each item was removed.  (Dkt. Nos. 6 at ¶ 29; 129-4 at 5.)  Strong and Mailloux searched each item of clothing and threw it to the floor.  (Dkt. No. 6 at ¶ 30.)  Plaintiff claims that Mailloux and Rendle remained in the room while Strong conducted a strip frisk.  (Dkt. Nos. 6 at ¶ 31; 129-4 at 5.)  Mailloux contends he waited outside the emergency room while Plaintiff was strip frisked.  (Dkt. No. 129-18 at ¶ 13.)

Plaintiff claims that after telling him to bend over and spread his buttocks, Strong slapped Plaintiff on the buttocks and told him to spread wider.  *Id.*  Strong and Rendle then began making derogatory comments about Plaintiff such as "This fucking nigger stinks," and "I should stick my

baton up this nigger's asshole for stinking up the fucking room," while others in the room laughed.  (Dkt. Nos. 6 at ¶¶ 32-34; 129-4 at 5.)  Rendle acknowledges supervising the strip frisk done by Strong and claims it was done without incident or use of force.  (Dkt. No. 129-13 at ¶¶ 8, 10.)

After the strip frisk, Strong ordered Plaintiff to get dressed facing the wall, and Plaintiff's hands were cuffed behind his back.  (Dkt. No. 6 at ¶ 35.)  According to Plaintiff, Rendle and three others then left the room to, as Plaintiff learned later, strip frisk another inmate who had been in the north yard, while Mailloux and Strong remained in the exam room with him.  (Dkt. No. 129-4 at 5.)  Nothing happened while Plaintiff was left alone with Mailloux and Strong.  *Id*.

Rendle and two other officers returned to the exam room where Strong and Mailloux had remained.  (Dkt. Nos. 6 at ¶ 39; 129-4 at 5-6.)  Plaintiff claims that Strong then asked him whose drugs had been found in the vicinity of the north yard.  (Dkt. Nos. 6 at ¶ 40; 129-4 at 6.)  When Plaintiff responded that he did not know, Strong told him to turn around so that he could answer the questions when facing him.  *Id*.  According to Plaintiff, Strong punched him in the left side of his face near his ear and jaw when he turned around, and Plaintiff fell into the wall, hitting his head.  (Dkt. Nos. 6 at ¶¶ 40-42; 129-4 at 6.)  Plaintiff claims that Rendle then asked him the same question and punched him even harder in the right side of his face by his ear, causing him to fall to the floor in pain.  (Dkt. Nos. 6 at ¶ 43; 129-4 at 6.)  When Rendle told Plaintiff to "answer the fucking question," Plaintiff again responded that he did not know.  (Dkt. No. 6 at ¶ 44.)

Plaintiff contends that after he fell, Strong stayed on Plaintiff's left side and began choking him while Rendle was on the other side punching him in the shoulder, ribs, and stomach area, while two other corrections officers began kicking his lower body and poking him in the

ribs with a baton.  (Dkt. Nos. 6 at ¶ 45; 129-4 at 6-7.)  Rendle at one point turned Plaintiff on his

side, and all four corrections officer kicked and stomped Plaintiff on his chest, shoulder, head,

stomach, legs, and back.  *Id.*  Plaintiff estimates he was kicked twenty to thirty times.  (Dkt. No.

129-4 at 7.)

Rendle then told Plaintiff to get up.  (Dkt. No. 129-4 at 7.)  When he was unable to do so,

Strong and non-party Sergeant Guynut picked him up by the handcuffs and stood him up.  *Id.*

Plaintiff's knee gave out two or three times, and he fell.  *Id.*  Strong and Guynut half carried and

half dragged Plaintiff from the emergency room to the Special Housing Unit ("SHU"), where he

was placed in a holding cell.  *Id.*  According to Plaintiff, Rendle threatened him by telling him

that if anyone asked him what happened he was to say that he had fallen and did not know what

happened, and if he did not they would kill him like they had done in October 2009, when an

inmate was beaten the same way and put in the box with no treatment and later died.  (Dkt. No. 6

at ¶ 48.)

Both Rendle and Strong have denied using any force on Plaintiff in connection with the

events on January 21, 2010.  (Dkt. Nos. 129-13 at ¶ 10; 129-16 at ¶ 10.)  Rendle and Strong have

also denied observing anyone else assaulting or using force against Plaintiff in connection with

the events on January 21, 2010.  (Dkt. Nos. 129-16 at ¶ 11; 131-20 at 1.)  Mailloux has denied

using force against Plaintiff or observing anyone else use force on him on January 21, 2010.

(Dkt. Nos. 129-18 at ¶¶ 14-15; 131-22 at 2.)  Although it has been suggested by Mailloux and

Rendle that Plaintiff may have been injured in an altercation with another inmate in the yard prior

to the time he was brought in by Mailloux (Dkt. Nos. 106-3 at 68; 131-20 at 4), Plaintiff has

denied having an altercation with another inmate on January 21, 2010.  (Dkt. No. 129-4 at 4.)

Furthermore, neither Mailloux nor Strong observed that Plaintiff had any injuries at the time he was brought to the north yard door on January 21, 2010.  (Dkt. Nos. 106-3 at 68, 75; 131-9 at 1; 131-10 at 1.)

### C.    Injuries and Medical Treatment

Plaintiff was taken directly to SHU from the facility emergency room by Rendle, Strong, and Guynut without being given any medical care for injuries sustained in the assault.  (Dkt. Nos. 6 at ¶ 52; 129-4 at 7.)  Plaintiff was placed in a holding cell in SHU and while there heard Rendle, Strong, and Guynut have a discussion with the SHU sergeant, who told them he would not allow Plaintiff to be placed in SHU without a medical assessment.  (Dkt. No. 129-4 at 7.)  Plaintiff claims that Rendle told the SHU sergeant to put Plaintiff in SHU without a medical assessment, and the sergeant refused.  *Id.*

After Strong and Guynut left Plaintiff at SHU, Defendant RN Taylor came to SHU to do a medical assessment of Plaintiff prior to his being housed in SHU.  *Id.* at 8.  Plaintiff claims that when the SHU sergeant told Taylor if he did not do a medical assessment of Plaintiff, Plaintiff would not be placed in SHU, Taylor told the sergeant that Rendle had instructed him not to document any significant, visible injuries or complaints by Plaintiff.  (Dkt Nos. 6 at ¶ 53; 129-4 at 8.)  Taylor was then told by the SHU sergeant to document something so that Plaintiff could be housed in SHU.  (Dkt. No. 129-4 at 8.)

Taylor completed an Inmate Injury Report on January 21, 2010, in which he noted that Plaintiff gave no statement.  (Dkt. No. 131-32 at 62.)  In his Declaration, Taylor states that Plaintiff told him he did not know how he had injured his hand and did not report that he had been assaulted by staff.  (Dkt. No. 129-21 at ¶ 12.)  Plaintiff claims he did tell Taylor what had

happened to him in the exam room. (Dkt. No. 129-4 at 9.)

 According to Taylor, Plaintiff was taken to the facility emergency room so that the Inmate Injury Report could be prepared and photographs could be taken. (Dkt. No. 129-21 at ¶ 12.) In the Report, Taylor identified the nature of Plaintiff's injuries as slight inflammation of the left side of his jaw and his left hand. (Dkt. No. 131-32 at 62.) Taylor prescribed ice for Plaintiff's jaw and ibuprofen for as long as necessary. *Id*. Plaintiff claims Taylor disregarded all of his medical complaints and attributes that to Taylor's alleged instructions from Rendle not to document significant, visible injuries. (Dkt. No. 129-4 at 9.) Taylor denies that anyone told him not to record any of Plaintiff's injuries and contends he recorded all of the injuries he observed at the time. (Dkt. No. 129-21 at ¶¶ 13-14.)

Plaintiff claims he made numerous requests for medical treatment in the form of sick call requests describing complaints of a fractured nose, finger, ear-pain, bleeding, and contusions to chest, shoulder, arms, torso, back, and legs. (Dkt. No. 6 at ¶ 54.) Plaintiff was seen by a nurse in SHU on January 22, 2010, after putting in a sick call request on January 21, 2010, and he told her about his injuries, including that he could not hear and his ear was oozing, and all of the difficulties he was having physically. (Dkt. Nos. 129-4 at 10; 129-21 at ¶ 15.) Plaintiff did not go to the facility hospital on January 22, 2010. (Dkt. No. 129-4 at 10.) Plaintiff put in another emergency sick call request on January 22, 2010, and was again seen by a nurse in SHU on January 23, 2010, and again received no medical attention. *Id*. at 10-11; Dkt. No. 129-21 at ¶ 15.

On January 23, 2010, Plaintiff reported the alleged assault to high level Department of Corrections and Community Supervision (DOCCS) officials who were making the rounds in SHU with the Deputy Commissioners of Security, Programs, and Administration. (Dkt. No. 129-

4 at 11.)  Plaintiff told them that he could not hear because his ear was hurting and his body was hurting.  *Id*.  The Deputy Commissioner of Administration told Plaintiff he would get medical attention as soon as she left SHU.  *Id*.  After the DOCCS officials left, corrections officers took Plaintiff to the emergency room where he was examined by a person whom he believed to be a nurse or nurse practitioner.  *Id*.  According to Plaintiff, the nurse noted that there was blood in Plaintiff's nose, blood in both of his ears, and his eyes were bloody.  *Id*.  The Ambulatory Health Record Progress Note on the examination notes blood in Plaintiff's nose and both ears, that he was unable to hear out of one ear, he had a jabbing pain when he swallowed, he had a pain level of 10/10 on palpitation of his left jaw, he was unable to open his mouth, and his eyes were red. (Dkt. No. 131-32 at 66.)  Plaintiff was referred to the CHVP Medical Center ("Medical Center"). *Id*. at 66.

A CT of Plaintiff's cervical spine done at the Medical Center on January 23, 2010, showed no fracture or dislocation.  *Id*. at 68.  A facial bones CT was also performed and no evidence of facial fracture was found.  *Id*. at 69.  An x-ray of Plaintiff's left hand taken on February 17, 2010, showed no fracture, dislocation, or adjacent soft tissue abnormality.  *Id*. at 76.

Plaintiff was, however, found to have a left tympanic membrane perforation (ruptured ear drum) on January 23, 2010, and was referred to an ENT for follow up.  *Id*. at 70.  According to DOCCS records, a mandible x-ray done on January 29, 2010, was negative for fracture.  *Id*. at 72. Plaintiff was found by Dr. Oliveira, DDS, to have a hematoma on the left side of his neck that might require draining, and a specialty care appointment with the ENT for evaluation of the hematoma was scheduled.  *Id*. at 72-73.  Plaintiff was examined by an ENT on February 2, 2010, and found to have a bilateral tympanic membrane perforation, neck contusion, and a deviated

9

septum.  *Id*. at 74-75.

### D.    Claim Against Defendant Lecuyer

At the time Plaintiff was searched, Strong allegedly found a weaponized tooth brush in Plaintiff's front coat pocket.  (Dkt. No. 129-5 at 1-2.)  When interviewed by Rendle, Plaintiff denied that the bag of marijuana and weapon belonged to him.  *Id*.  After Plaintiff filed a complaint regarding the alleged assault in the Court of Claims, he learned from Assistant Clinton County District Attorney Collyer that he had been indicted on weapons and drug charges in Clinton County.  (Dkt. No. 129-4 at 54-55.)

During the course of the criminal prosecution, Collyer learned from Plaintiff's defense counsel that Plaintiff might have suffered injuries at Clinton that may have been linked to the issues in the criminal matter.  (Dkt. No. 129-9 at 1.)  On July 12, 2011, Collyer obtained a judicial subpoena duces tecum to obtain Plaintiff's medical records.  (Dkt. Nos. 129-8 at 1; 129-10 at 1-4.)  After receiving the records, Collyer wrote to the Hon. Kevin K. Ryan informing him that he had learned from the subpoenaed records, including DOCCS Ambulatory Health Record Progress Notes, Inmate Injury Reports, and Medical Center records, that it appeared Plaintiff had suffered facial trauma and a perforated left eardrum on or about January 21, 2010, the date of the criminal offenses.  (Dkt.  No. 129-9 at 1.)  The information raised concerns about what had transpired that were significant enough to lead the People of the State of New York to decide against prosecuting Plaintiff on the weapons and drug charges on July 13, 2011.  *Id*.

Plaintiff claims that Collyer had asked Defendant Nurse Administrator Lecuyer to have Plaintiff sign a HIPAA release so that Collyer could obtain his medical records.  (Dkt. No. 129-4 at 15-16.)  When Plaintiff refused to sign the release, Lecuyer told him Collyer would get the

records anyway. *Id*. at 16. According to Plaintiff, Collyer did obtain copies of his medical records without his consent. *Id*. In his amended complaint, Plaintiff has alleged that Lecuyer violated his right to medical privacy under the Fourteenth Amendment by giving Collyer copies of his medical records without authorization. (Dkt. No. 6 at ¶ 58.)

## III.    APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56©; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining

the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).  A plaintiff's verified complaint is to be treated as an affidavit.[5]  *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff."  "To defeat summary judgment, . . . nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation."  *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted).  "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Id.* (citation and internal quotation marks omitted).  "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations.  "*Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997)  (citation omitted).  "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball*

---

[5]  Plaintiff's Amended Complaint this case was properly verified under 28 U.S.C. § 1746.  (Dkt. No. 6 at 14.)  *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (use of the language "under penalty of perjury" substantially complies with § 1746).

*Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999)[6] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002) (quoting *Heublein v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (internal quotation marks omitted).

## IV.    ANALYSIS

### A.    Official Capacity Claims for Money Damages

Plaintiff has sued all of the Defendants for money damages under § 1983 in both their individual and official capacities. (Dkt. No. 6 at ¶ 1. ) Defendants seek summary judgment on Plaintiff's § 1983 claims for money damages against them in their official capacities on the grounds that the claims are barred by the Eleventh Amendment. (Dkt. No. 129-2 at 18.)

The Eleventh Amendment protects states against suits brought in federal court. *Alabama*

---

    [6] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

*v. Pugh*, 438 U.S. 781, 782 (1978).  The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state.  *Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006).  The Eleventh Amendment bars all money damages claims against state officials acting in their official capacities, including the DOCCS Defendants herein.  *Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985); *Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (an inmate plaintiff's claims for damages against individual DOCCS employees sued in their official capacities are considered claims against New York and are thus barred by the state's Eleventh Amendment immunity).

Therefore, the Court recommends that Defendants be granted summary judgment as to Plaintiff's § 1983 claims for money damages against them in their official capacities on Eleventh Amendment grounds.

**B.      Exhaustion of Administrative Remedies as to Claims Against Defendants Lecuyer and Mailloux**

Defendants Lecuyer and Mailloux seek summary judgment on the grounds that Plaintiff has failed to exhaust his administrative remedies with respect to his claim for the violation of his right to medical privacy against Lecuyer under the Fourteenth Amendment and his Eighth Amendment failure to intervene claim alleged against Mailloux.

1.      <u>General Exhaustion Requirements Under the Prison Litigation Reform Act and the DOCCS Inmate Grievance Procedure</u>

"The Prison Litigation Reform Act of 1995 ("PLRA"), mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions.  42 U.S.C. § 1997e(a)."  *Ross v. Blake*, ___ U.S. ___, 136 S.Ct. 1850, 1855 (2016).

"[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). In New York state prisons, DOCCS has a well-established three-step internal grievance procedure ("IGP"). N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 7, § 701.5 (2013).

Generally speaking, the DOCCS IGP involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a) (2010). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*Id*. at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id*. at § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id*. at § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id*. at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are

forwarded directly to the Central Office Review Committee ("CORC") for a decision under the process applicable to the third step. *Id.* at § 701.5(c)(3)(I).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(I). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* at § 701.5(d)(3)(ii).

The IGP has an expedited procedure for harassment grievances which pertain to "[e]mployee conduct meant to annoy, intimidate, or harm an inmate." *Id.* at § 701.11(a). The grievance is sent directly to the Superintendent, who is required to conduct an investigation and render a decision. *Id.* at § 701.11(b). An appeal from the Superintendent's decision is taken to CORC. *Id.* at § 701.11(b)(7).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford*, 548 U.S. at 93. Because failure to exhaust is an affirmative defense, defendants bear the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies. *See Jones*, 549 U.S. at 216 ("We conclude that failure to exhaust is an affirmative defense under the PLRA"); *Bailey v. Fortier,* No. 09-CV-0742 (GLS/DEP), 2012 WL 6935254, at *6 (N.D.N.Y. Oct. 4, 2012) (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence).

### 2.    Analysis of Administrative Exhaustion as to the Claim Against Lecuyer

The Inmate Grievance Program Supervisor ("IGP Supervisor") at Clinton has stated in her Declaration that as IGP Supervisor, she is one of the persons responsible for keeping records of grievances filed at Clinton, and that the grievance records show that Plaintiff did not file a

grievance regarding his right to privacy violation claim against Lecuyer. (Dkt. No. 129-4 at ¶¶ 1, 3-4, 18.) The Assistant Director of the DOCCS IGP has submitted a Declaration in which he has stated that he is the custodian of records maintained by CORC, and that based upon a review of CORC records, Plaintiff at no time appealed a grievance for violation of his right to privacy at Clinton on January 21, 2010, or at any time thereafter. (Dkt. No. 129-8 at ¶¶ 1-2, 10, 13.)

Plaintiff contends that he exhausted his administrative remedies with regard to his right to privacy claim against Lecuyer through the filing of his February 8, 2010, grievance. (Dkt. Nos. 131-30 at 3;145 at 4.) However, Plaintiff's February 8, 2010, predated the criminal charges that led to Collyer's involvement and his request for issuance of the July 11, 2011, judicial subpoena duces tecum for Plaintiff's medical records regarding the January 21, 2010, incident. (Dkt. No. 129-8 at 1.) Therefore, Plaintiff's February 8, 2010, grievance could not possibly have included his violation of privacy claim against Lecuyer. Furthermore, there is no mention of the disclosure of Plaintiff's medical records by Lecuyer in the February 8, 2010, grievance. (Dkt. No. 131-32 at 3.)

The Court finds that Plaintiff failed to exhaust his administrative remedies with regard to his claim against Lecuyer. Furthermore, Plaintiff has made no claim or offered any evidence that the grievance procedure was unavailable to him with regard to his claim against Lecuyer. *See Ross*, 136 S.Ct. at 1859-60 (the administrative procedure for exhaustion is unavailable where it operates as a simple dead end with officers unable or consistently unwilling to provide relief to aggrieved inmates; it is so opaque that it becomes, practically speaking, incapable of use; or when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation").

Based upon the foregoing, the Court recommends that Defendant Lecuyer's motion for summary judgment on failure to exhaust grounds be granted and Plaintiff's cross-motion for summary judgment against Lecuyer be denied.

3.    Analysis of Administrative Exhaustion as to the Claim Against Mailloux for Failure to Intervene

Defendant Mailloux was identified by name in grievance complaint (CL-59669-10) filed by Plaintiff with regard to the incident on January 21, 2010.[7]  (Dkt. No. 131-32 at 3.)  Mailloux nonetheless seeks summary judgment on Plaintiff's failure to intervene claim on exhaustion grounds because Plaintiff did not specifically allege in the grievance that Mailloux had failed to intervene in the alleged assault against him.  (Dkt. No. 129-2 at 9-10.)

Under the PLRA, to properly exhaust administrative remedies, a prisoner must complete the administrative review in accordance with the procedural rules defined by the prison grievance system.  *See Jones*, 549 U.S. at 218 ("the level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion").  7 NYCRR § 701.5(a)(2) (2007) provides that the complaint "must contain a concise, specific description of the problem and the action requested."

In *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004), the Second Circuit described the exhaustion requirement as "not dissimilar to the rules of notice pleading" and held that because the PLRA's exhaustion requirement requires that prison officials be afforded the time

---

[7]  The absence from the summary judgment record of an initial determination of the grievance by the IGRC, as well as the subject matter of the grievance indicate that the grievance was handled under the expedited procedure for harassment grievances at 7 NYCRR § 701.11.

and opportunity to address a complaint internally, "[i]n order to exhaust . . . inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." In *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006), the Court explained that "[a]s in a notice pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming." (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)). A grievance "may not be so vague as to preclude prison officials from taking appropriate measures to resolve the complaint internally." *Brownell*, 446 F.3d at 310.

Plaintiff's February 8, 2010, grievance regarding the alleged assault on January 21, 2010, states that Mailloux escorted him from the north yard and pat frisked him. (Dkt. No. 131-32 at 3). The grievance further states that Mailloux, along with Strong, escorted Plaintiff to the facility hospital emergency room where Strong conducted a strip frisk of Plaintiff and then, with Rendle and six other security staff members, assaulted Plaintiff, punching him in the face and viciously and brutally punching, kicking, choking, stomping, and beating him for ten minutes. *Id*.

The grievance clearly places Mailloux in the emergency room prior to the alleged assault. *Id*. The grievance is silent, however, as to whether Mailloux remained in the emergency room area after escorting Plaintiff there and was aware of the ongoing assault, or had left the area prior to the assault. *Id*. The Court finds that by placing Mailloux in the emergency room in close temporal proximity to the strip search and alleged assault and giving no indication in the grievance that Mailloux had thereafter left the area, Plaintiff provided enough information to allow prison officials to take "appropriate measures to resolve the complaint internally" as to the failure to protect claim against Mailloux. *Brownell*, 446 F.3d at 310.

Furthermore, the record evidence supports the inference that prison officials did investigate Mailloux's actions in connection with the complaint set forth in Plaintiff's grievance and were informed by Mailloux that he did not observe the use of force. A very cursory Superintendent's determination of Plaintiff's grievance, dated March 2, 2010, states that "[i]nvolved staff have gone on record denying grievant's allegations. No evidence of staff malfeasance was found." (Dkt. No. 129-27 at 1.) Inasmuch as Mailloux was identified in Plaintiff's grievance, the Court can infer for purposes of this motion that Mailloux was one of the "involved staff" referenced in the Superintendent's decision. In addition, prior to CORC's August 4, 2010, determination upholding the decision of the Superintendent (Dkt. No. 131-32 at 5), Mailloux submitted a March 18, 2010, memorandum relevant to Plaintiff's failure to intervene claim to Rendle, in which he stated that he at no time observed force being used on Plaintiff on January 21, 2010. (Dkt. No. 131-22 at 2.) Moreover, as noted above, under Second Circuit case law, the fact that the grievance does not specifically assert a claim for failure to intervene in the alleged assault in no way mandates a finding that Plaintiff failed to exhaust his claim against Mailloux. *See Brownell*, 446 F.3d at 310 (grievant need not articulate legal theories).

Based upon the foregoing, the Court finds that Plaintiff's grievance was adequate to exhaust his administrative remedies with respect to his failure to intervene claim against Defendant Mailloux and recommends that Mailloux's motion for summary judgment on exhaustion grounds be denied.

### C. Eighth Amendment Excessive Force Claims Against Strong and Rendle

Strong and Rendle have not moved for summary judgment on Plaintiff's Eighth

Amendment excessive force claims against them. Plaintiff, however, has cross-moved for summary judgment on those claims. (Dkt. No. 131.)

"The Eighth Amendment prohibits the infliction of cruel and unusual punishments . . . including the unnecessary and wanton infliction of pain." *Giffen v. Crispen*, 193 F.3d 89, 91 (2d Cir. 1999) (citation and internal quotation marks omitted). An Eighth Amendment excessive force claim has two elements "one subjective focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. 1, 7-8 (1992)).

"The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (quoting *Wright*, 554 F.3d at 268)) (internal quotation marks omitted). The test for wantonness on an excessive force claim "is whether the force was used in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Id*., (quoting *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (in determining whether defendants acted maliciously or wantonly, "a court must examine several factors including: the extent of the injury and mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.") (citation and internal quotation marks omitted)).

The objective component requires a showing that the "conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Harris*, 818 F.3d at 64

(citation omitted). The Supreme Court has emphasized that after *Hudson*, the "core judicial inquiry" shifted "from the extent of the injury to the nature of the force    specifically, whether it was nontrivial and 'was applied . . . maliciously and sadistically to cause harm.'" *Wilkins v. Gaddy*, 559 U.S. 34, 39 (2010) (quoting *Hudson*, 503 U.S. at 7).

Plaintiff contends that while he was handcuffed, Strong and Rendle punched him in the face, shoulder, ribs, and stomach area; choked him; kicked him in the chest, shoulder, head, stomach, legs, and back; and poked him in the ribs with a baton, when he told them he did not know whose drugs were found in the yard. (Dkt. Nos. 6 at ¶ 45; 129-4 at 6-7.) Medical records submitted by Plaintiff in support of his motion reveal that it was subsequently found that both of Plaintiff's eardrums were ruptured, he had a hematoma on his neck, and he had a deviated septum. (Dkt. No. 131-32 at 72-75.) As discussed below, however, Defendant Taylor, who examined Plaintiff shortly after the alleged assault, documented only a slight inflammation of Plaintiff's left jaw and hand. (Dkt. No. 131-32 at 62.)

Were the Court to consider only Plaintiff's evidence in support of his excessive force claim, it would find that Strong and Rendle had the necessary level of culpability to establish the subjective component of Plaintiff's claim. However, Strong and Rendle have denied using any force against Plaintiff on January 21, 2010, both in documents that are a part of the facility investigation into the incident and in Declarations submitted by them in opposition to Plaintiff's motion. (Dkt. Nos. 129-13 at ¶ 10; 129-15 at 1; 129-16 at ¶ 10; 131-21 at 2.) Moreover, as discussed below, Defendant Taylor, who examined Plaintiff shortly after the alleged assault, documented only a slight inflammation of Plaintiff's left jaw and hand. (Dkt. No. 131-32 at 62.)

On a summary judgment motion, a court may not "weigh the evidence but is instead

required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). "The weighing of the evidence and the determination as to which version of the events to accept are matters for the jury." *Id.* at 856. *See also Hayes v. New York City Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996) (on a summary judgment motion "the court should not weigh evidence or assess the credibility of witnesses . . . . These determinations are within the sole province of the jury." ).

Because weighing the conflicting evidence in the summary judgment record and assessing the credibility of the parties is within the sole province of the jury, the Court recommends that Plaintiff's motion for summary judgment against Strong and Rendle on his Eighth Amendment excessive force be denied.

### D.    Eighth Amendment Failure to Intervene Claim Against Mailloux

Mailloux has not moved for summary judgment on the merits with regard to Plaintiff's claim that he failed to intervene in the alleged excessive force by Strong and Rendle. Plaintiff has, however, cross-moved for summary judgment against Mailloux on the claim.

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes*, 84 F.3d at 620 (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Law enforcement officials, including prison officials, can be held liable under § 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence. *Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001); *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (prison official's Eighth Amendment duty to take reasonable

measures to guarantee the safety of inmates in their custody includes a duty to protect inmates from harm threatened by other officers).  Liability under § 1983 for failure to intervene can arise where a prison corrections officer fails to prevent another corrections officer from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008), *aff'd*, 461 F. App'x 18 (2012).

Plaintiff claims that Mailloux was present during Strong and Rendle's use of excessive force on January 21, 2010, and did nothing to intervene.  (Dkt. Nos. 6 at ¶¶ 38-40; 129-4 at 5-6; 131-2 at ¶¶ 37-39.)  In his memorandum of March 18, 2010, regarding the January 21, 2010, incident, Mailloux states that he at no time observed any force used on Plaintiff.  (Dkt. No. 131-22.)  In his Declaration, Mailloux claims that he waited outside the facility emergency room while Plaintiff was strip frisked and was never present inside the first floor emergency room with Plaintiff on January 21, 2010.  (Dkt. No. 129-18 at ¶¶ 7-8.)  According to Mailloux, he walked to the lab to have the green leafy substance found in the bag tested after Plaintiff was strip frisked. *Id*. at ¶ 9.

Given the foregoing, the Court finds that there are material issues of fact in dispute with regard to Plaintiff's failure to intervene claim against Mailloux and recommends that Plaintiff's cross-motion for summary judgment on his failure to intervene claim be denied.

**E.    Eighth Amendment Medical Indifference Claim Against Defendants Strong, Rendle, and Taylor**

Defendants Strong, Rendle, and Taylor seek summary judgment on Plaintiff's Eighth Amendment medical indifference claim. Plaintiff has cross-moved for summary judgment on the claim. For reasons explained below, the Court finds that there are material issues of fact in dispute precluding summary judgment in either Plaintiff's or Defendants' favor on the claim.

An inmate's claim that he was denied medical care is also analyzed under the Eighth Amendment's prohibition of cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 101-03 (1976). "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Id*. at 104 (citation and internal quotation marks omitted). As with other Eighth Amendment cruel and unusual punishment claims, an inmate must satisfy a standard that includes both objective and subjective components. *See Taylor v. Goorde*, 548 F. App'x 696, 697-97 (2d Cir. 2013).

The objective component examines whether the inmate was actually deprived of adequate medical care and whether the denial was "sufficiently serious." *Salahuddin,* 467 F.3d at 280. Where there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). The subjective component concerns the defendant's mental state, and requires that the defendant acted "with deliberate indifference to inmate health"    "a mental state equivalent to subjective recklessness [as the term is used in criminal law]." *Salahuddin*, 467 F.3d at 280. That requires a showing that the charged official was aware of facts from which the inference could be drawn

that a substantial risk of harm existed, drew that inference, and did nothing.  *See Farmer*, 511
U.S at 837.

1.      Serious Medical Condition

A "serious medical condition" is a "condition of urgency, one that may produce death,
degeneration, or extreme pain."  *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J.
dissenting) (citations omitted); *accord Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994);
*Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).  Relevant factors to consider when
determining whether an alleged medical condition is sufficiently serious include, but are not
limited to: (1) the existence of any injury that a reasonable doctor or patient would find important
and worthy of comment or treatment; (2) the presence of a medical condition that significantly
affects an individual's daily activities; and (3) the existence of chronic and substantial pain.
*Chance*, 143 F.3d at 702-03.

Plaintiff has alleged a brutal beating at the hands of Strong and Rendle on January 21,
2010.  (Dkt. No. 129-4 at 6-7.)  The Court has found that there are material issues of fact in
dispute regarding Plaintiff's excessive force claim in light of Strong and Rendle's denials and
Taylor's initial report of Plaintiff's medical condition following the alleged assault.  (Dkt. Nos.
129-13 at ¶ 10; 129-16 at ¶ 10.)  Plaintiff testified at his deposition that after the beating, he was
unable to get up on his own and had to be half carried and half dragged from the emergency room
to SHU by Strong and Guynut.  *Id*. at 9.  Plaintiff also testified that after the assault, he had blood
coming out of his ear and lip, something on his neck, and skin scraped off his shoulder, back,
arms, and legs from the stomping during the assault.  (Dkt. No. 129-4 at 7.)  The evening of the
alleged assault, Plaintiff put in a sick call slip, and the next day told the nurse that, among other

things, his ear was oozing and he could not hear.  *Id*. at 10.

The facility nurse who examined Plaintiff on January 23, 2010, noted that Plaintiff was unable to hear out of one ear, had a painful left jaw, and was unable to open his mouth.  (Dkt. No. 131-32 at 65-66.)  A decision was made that Plaintiff required outside medical treatment.  *Id*.  When Plaintiff was examined at the Medical Center on January 23, 2010, he was diagnosed with a ruptured left eardrum and referred to an ENT.  *Id*. at 70.  Plaintiff was subsequently found to have a hematoma on the left side of his neck, ruptured ear drums in both ears, a neck contusion, and a deviated septum.  *Id*. at 72-75.

Defendants Strong, Rendle, and Taylor claim that Plaintiff has failed to establish that he suffered from a serious medical need on January 21, 2010.  (Dkt. No. 129-2 at 12-13.)  According to Taylor, he did not observe any bleeding on Plaintiff, and he recorded all of the injuries he saw on Plaintiff when he examined him on January 21, 2010.  (Dkt. No. ¶¶ 9, 13.)  Those injuries included only a slight inflammation on the left side of Plaintiff's jaw and his left hand.  (Dkt. No. 131-32 at 62.)  Defendants also rely on the notation that no bleeding was noted in the January 21, 2010, entry on Plaintiff's Ambulatory Health Record.  (Dkt. Nos. 131-32 at 6; 129-22 at 10.)

Defendants further note that the results of CT scans and x-rays performed at the Medical Center on January 23, 2010, revealed no evidence of fractures to Plaintiff's facial bones or bones in his left hand and fingers.  (Dkt. No. 129-2 at 12.)  As to Plaintiff's ruptured eardrum found on January 23, 2010, Defendants argue that it did not constitute a serious medical condition because the discharge note from the Medical Center found that "recently ruptured ear drums usually heal on their own," and it "could have been cause by injury or infection." (Dkt. No. 129-2 at 13.)

They also note that follow up testing at the Albany Medical Center on August 12, 2010, found that the ear drum had healed and Plaintiff's hearing was normal.

The Court finds that Plaintiff has raised an issue of material fact with respect to Taylor's findings regarding Plaintiff's physical condition when he examined him on January 21, 2010. Plaintiff testified at his deposition that when Taylor came to SHU to do a medical assessment of Plaintiff, as required before Plaintiff would be admitted to SHU, Taylor told the SHU sergeant that Rendle had instructed him not to document any significant visible injuries or complaints by Plaintiff. (Dkt. No. 131-32 at 62.) According to Plaintiff, the SHU sergeant told Taylor he had to document something so that Plaintiff could be housed in SHU. *Id*. While Taylor has denied anyone telling him not to record injuries and contends he recorded all injuries he saw (Dkt. No. 129-21 at ¶¶ 13-14), the Court finds that the record, including the allegations in Plaintiff's Amended Complaint and his deposition testimony, along with medical records from January 23, 2010, and subsequent thereto regarding Plaintiff's physical condition, reveal questions of material fact as to whether all of Plaintiff's injuries were recorded by Taylor, and whether Plaintiff presented with a serious medical condition as required for an excessive force claim on January 21, 2010.

Further, the Court finds that there are arguably material questions of fact as to whether the ruptured ear drum found on January 23, 2010, constituted a serious medical condition.[8] The facility nurse who noted, *inter alia*, blood in both of Plaintiff's ears found Plaintiff's condition sufficiently serious to telecommunicate with Dr. Adam, who informed her by telemed that

---

[8] As noted above, Plaintiff was subsequently found to have two ruptured ear drums as well as a deviated septum. (Dkt. No. 131-32 at 74-75.)

Plaintiff should go to the Medical Center. (Dkt. No. 131-32 at 65.) Moreover, although the records from the Medical Center indicate that ruptured ear drums generally heal on their own, the Medical Center found Plaintiff's ruptured ear drum sufficiently serious to refer him to an ENT for follow up, and follow up continued into August 2010, when Plaintiff was given a hearing test. (Dkt. Nos. 131-32 at 70; 139-1 at 16-17.)

##### 2. Deliberate Indifference

The Court also finds that there are material questions of fact on the issue of whether Strong, Rendle, and Taylor were deliberately indifferent to Plaintiff's allegedly serious medical needs on January 21, 2010. Defendants Strong, Rendle, and Taylor assert that they were not deliberately indifferent to Plaintiff's medical needs because Strong and Rendle escorted Plaintiff to SHU immediately after the strip frisk on January 21, 2010, and upon Plaintiff's admission to SHU, Taylor conducted a medical evaluation and noted only a slight inflammation in Plaintiff's jaw and hand and treated Plaintiff by ordering Ibuprofen and ice. (Dkt. No. 129-2 at 14-15.)

However, as noted above, Plaintiff claims that he had blood coming out of his ear when he was taken to SHU, and he heard Taylor tell the SHU sergeant that he had been instructed by Rendle not to document any significant injuries or complaints. Furthermore, while Taylor claims that Plaintiff did not tell him about what had transpired in the exam room, Plaintiff contends that he did. (Dkt. Nos. 129-4 at 9; 129-21 at ¶ 12.) As to Strong and Rendle, while the Court has concluded that there are questions of fact with regard to Plaintiff's excessive force claim, were a jury to find that Plaintiff was assaulted by Strong and Rendle in the manner he claims and injured in the manner he claims, the jury might reasonably find that not taking Plaintiff for medical treatment after the assault constituted deliberate indifference to his serious medical needs.

Based upon the foregoing, the Court finds that there are questions of material fact in dispute with regard to Plaintiff's Eighth Amendment medical indifference claim that precludes a grant of summary judgment to either the moving Defendants or Plaintiff, and recommends that Defendants' motion and Plaintiff's cross-motion be denied.

**ACCORDINGLY**, it hereby

**RECOMMENDED** that Defendants' motion for partial summary judgment (Dkt. No. 129) be **GRANTED** as to Defendant Lecuyer and be **DENIED** as to Defendants Strong, Rendle, Mailloux, and Taylor; and it is further

**RECOMMENDED** that Plaintiff's cross-motion for summary judgment (Dkt. No. 131) be **DENIED**; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: July 12, 2016
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

2012 WL 6935254
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Everton BAILEY, Plaintiff,
v.
M. FORTIER, Defendant.

Civ. Action No. 9:09–CV–0742 (GLS/DEP).
|
Oct. 4, 2012.

**Attorneys and Law Firms**

Hancock Estabrook LLP, Michael J. Sciotti, Esq., Robert Thorpe, Esq., of Counsel, Syracuse, NY, for Plaintiff.

Hon. Richard S. Hartunian, United States Attorney, Charles E. Roberts, Esq., Assistant U.S. Attorney, of counsel, Syracuse, NY, for Defendant.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Everton Bailey, a federal prison inmate, has commenced this *Bivens*[1] action against defendant Michelle Fortier, a corrections officer stationed at the prison facility in which Bailey was confined at the relevant times, alleging deprivation of his civil rights. Bailey's claims are based upon Fortier's alleged failure to protect him from an assault by a cellmate, despite having registered prior complaints expressing fear for his safety.

Currently at the forefront of the action is the threshold question of whether Bailey, who admits that he did not file a grievance following the procedures in place at Bureau of Prisons ("BOP") facilities, should be excused from the requirement of exhausting administrative remedies before commencing suit due to the alleged refusal of prison officials to provide him with the forms necessary to file a grievance. Because I find, based upon an evidentiary hearing conducted, that Bailey was not prevented by the actions of prison officials from filing a grievance regarding his claim against Fortier, and that he has offered no special circumstances providing a basis to excuse his failure to exhaust administrative remedies, I recommend that his

complaint be dismissed on this procedural basis, without addressing its merits.

**I. *BACKGROUND***

Bailey is a federal prison inmate currently being held in the custody of the BOP as a result of a 2007 criminal conviction entered in the United States District Court for the Eastern District of Pennsylvania. *See generally* Complaint (Dkt. No. 1); *see also* VanWeelden Decl. (Dkt. No. 10–4) ¶ 5; June 20, 2012 Hearing Transcript (Dkt. No. 44) at p. 84.[2] While he is presently housed in another BOP facility, at times relevant to this litigation Bailey was designated by the BOP to the Ray Brook Federal Correctional Institution ("FCI Ray Brook"), located in Ray Brook, New York. *Id.*

On the morning of February 23, 2009, while housed in a six-person cell in the Mohawk Housing Unit at FCI Ray Brook, Bailey was confronted and physically assaulted by one of his cellmates after being accused of stealing that inmate's prayer oil. Complaint (Dkt. No. 1) ¶¶ 8–9; *see also* VanWeelden Decl. (Dkt. No. 10–4) Exh. D. Bailey reported the incident to Fortier, and requested that he be moved to another cell. Complaint (Dkt. No. 1) ¶ 10. That request was denied, and Bailey was directed by Fortier to return to his cell in light of an impending inmate count. *Id.* at ¶ 11.

Following the inmate count, Bailey again was accosted by the same inmate, who on this occasion threw hot oil from a ceramic mug onto his face.[3] Complaint (Dkt. No. 1) ¶ 13; VanWeelden Decl. (Dkt. No. 10–4) Exh. D; Tr. 100, 145. Bailey suffered second degree burns to his face resulting in his being hospitalized at an outside medical facility for a period of fourteen days. Complaint (Dkt. No. 1) ¶¶ 13–14; Tr. 32, 84–85. Upon his return to FCI Ray Brook, Bailey was placed in a special housing unit ("SHU") cell, where he remained until he was transferred to another BOP facility. Tr. 59–60, 85.

**\*2** The BOP has established an Administrative Remedy Program ("ARP"), comprised of a four-step administrative process through which inmates can seek formal internal review of any complaint regarding any aspect of their imprisonment. Tr. 10; 28 C.F.R. § 542.10 et seq.; *see also Macias v. Zenk,* 495 F.3d 37, 42 (2d Cir.2007). In accordance with the established ARP protocol, an inmate must first attempt informal resolution

of his or her complaint by presenting the issue informally to staff, and staff must attempt to resolve the issue. 28 C.F.R. § 542.13(a); *see also Johnson v. Testman,* 380 F.3d 691, 693 (2d Cir.2004). This informal, initial procedure typically begins with the filing of a "cop-out," which can be submitted either on a BP–8 form available to inmates through several sources, including their assigned counselors, or on paper of any other description. Tr. 10, 22, 27, 66–67, 129, 142.

If the complaint cannot be resolved informally, the inmate may next submit a formal written Administrative Remedy Request ("ARR") to the warden of the facility, utilizing a BP–9 form, within twenty calendar days of the event that generated the inmate's complaint. [4] Tr. 22, 32, 44; 28 C.F.R. § 542.14(a); *see also Johnson,* 380 F.3d at 693. That twenty-day period, however, can be extended in appropriate circumstances. [5] Tr. 33, 54, 144. If that formal request is denied, the inmate may next appeal the matter to the appropriate BOP Regional Director, utilizing a BP–10 form, within twenty calendar days of the date the grievance is denied by the facility warden. Tr. 22; 28 C.F.R. § 542.15(a); *see also Johnson,* 380 F.3d at 693. An unfavorable decision from the Regional Director can then be appealed to the General Counsel's office, utilizing a BP–11 form, within twenty calendar days of the date of the Regional Director's response. Tr. 22; 28 C.F.R. § 542.15(a).

Despite the existence of the ARP, Bailey did not avail himself of that process by filing a grievance regarding the assault or the defendant's alleged failure to protect him from it. Tr. 101–02, 106. Bailey claims that he requested the appropriate forms for commencing the grievance process from several prison workers, including Hawley Snyder, Barbara Darrah, and the warden at FCI Ray Brook. Tr. 86–88, 91, 93–95, 107–09. Employees at FCI Ray Brook, however, uniformly testified that Bailey never requested the appropriate grievance forms from them. *See* Tr. 72, 131, 146–47, 153, 155, 168; *see also* Tr. 49 (Robin Van Weelden); 161 (Jean Marie Diehl); 166 (Michelle Gonyea). I credit the testimony of defendant's witnesses and find that Bailey failed to ask his corrections counselor, or any other BOP employee at FCI Ray Brook, for the necessary forms to commence the grievance process.

The record also reflects that Bailey had abundant opportunity to secure the necessary grievance forms. In February and March of 2009, he was assigned a unit

team that included Barbara Darrah, his unit manager; Michelle Gonyea, a case worker; Hawley Snyder, his assigned corrections counselor; and one other corrections counselor. [6] Tr. 46, 86, 140–41. Members of Bailey's unit team, particularly his corrections counselor, were in frequent contact with him. *See, e.g.,* Tr. 126, 129–30, 140–41, 165.

**\*3** Various other BOP officials were also in regular contact with Bailey, making periodic rounds of the FCI Ray Brook SHU. Tr. 35. For example, at the times relevant to this litigation, the facility's warden typically visited the SHU every Wednesday morning, normally accompanied by Robin Van Weelden, who in February 2009 served as a legal assistant, as well as one or two associate wardens, a corrections captain, and unit team members. Tr. 35, 55. When making those rounds the group would proceed from cell to cell, knocking on doors and asking whether an inmate in a particular cell wished to voice any needs. Tr. 57. In addition, Barbara Darrah, as a unit manager, was required to visit inmates in the SHU twice weekly, although she testified that she was in that portion of the facility "pretty much daily." Tr. 126. When visiting the SHU, Darrah generally carried with her a folder of various forms, including BP–8, BP–9, BP–10, BP–11 and cop-out forms, earning her the nickname "the form lady." Tr. 70–71, 120, 124–27, 131. Like the warden and the warden's group, when visiting the SHU facility Darrah normally would proceed from cell-to-cell. Tr. 128. Similarly Michelle Gonyea, as plaintiff's case manager during February and March of 2009, was required to visit the SHU at least once weekly. Tr. 165.

Despite all of those visits and requests as to whether he needed anything, Bailey did not ask any of those individuals for the forms necessary to grieve Fortier's alleged failure to protect him from harm. Tr. 161–62, 166, 49–50, 72, 132, 144, 154–55, 161, 166.

As previously indicated, plaintiff was absent from FCI Ray Brook receiving outside treatment for his injuries during the fourteen-day period immediately following the inmate assault. In accordance with FCI Ray Brook policy requiring visits by prison officials to any inmate hospitalized for more than five days, Darrah, as plaintiff's unit manager, visited him in or about March of 2009, while he was a patient at the Adirondack Medical Center in Saranac Lake, in order to insure that his needs were being

met. Tr. 133. When asked on that occasion whether he needed anything, Bailey replied, "No." [7] *Id.*

## II. *PROCEDURAL HISTORY*

Bailey commenced this action on June 29, 2009. Dkt. No. 1. His complaint identifies Corrections Officer M. Fortier as the sole named defendant, and alleges that she violated his constitutional rights by failing to protect him from foreseeable harm. *Id.*

On January 8, 2010, prior to answering, Fortier moved to dismiss Bailey's complaint for failure to state a claim upon which relief may be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure or, alternatively, for summary judgment pursuant to Rule 56. Dkt. No. 10. The sole basis for Fortier's motion was her contention that Bailey's complaint is subject to dismissal based upon his failure to exhaust available administrative remedies before commencing suit, as required under 42 U.S.C. § 1997e(a). That motion resulted in my issuance of a report on August 30, 2010, recommending that the motion be denied, based upon the existence of genuine disputes of material fact to be resolved before addressing whether a proper basis for excusing the governing exhaustion requirement had been demonstrated. Dkt. No. 19. That recommendation was adopted by Chief District Judge Gary L. Sharpe on October 12, 2010. Dkt. No. 21.

**\*4** Following the issuance and acceptance of my report and recommendation, the parties were afforded the opportunity to engage in discovery, and a scheduling order was entered requiring, *inter alia,* that any additional dispositive motions be filed on or before October 3, 2011. *See* Dkt. No. 23. All deadlines under that scheduling order have passed, without the filing of any additional motions, and the case is now trial-ready. In light of the existence of a threshold procedural issue regarding exhaustion, the matter was referred to me for the purpose of conducting an evidentiary hearing, pursuant to *Messa v. Goord,* 652 F.3d 305 (2d Cir.2011), in order to develop the record concerning Bailey's efforts to satisfy his exhaustion requirement. *See* Text Entry 11/02/11. That hearing was conducted on June 20, 2012, *see* Text Entry 6/20/12, and, following the close of the hearing, decision was reserved pending briefing by the parties. [8], [9]

## III. *DISCUSSION*

### A. *Governing Legal Principles*

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002). An inmate plaintiff's complaint is subject to dismissal if the evidence establishes that he or she failed to properly exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias,* 495 F.3d at 43 (citing *Woodford* ). Complete exhaustion has not occurred, for purposes of the PLRA, until all of the steps of that available process have been taken. *Macias,* 495 F.3d at 44; *see also Johnson v. Rowley,* 569 F.3d 40, 45 (2d Cir.2009); *Strong v. Lapin,* No. 90–CV–3522, 2010 WL 276206, at \*4 (E.D.N.Y. Jan.15, 2010) ("Until the BOP'S Central Office considers the appeal, no administrative remedy is considered to be fully exhausted.").

**\*5** In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted in the event of a failure to satisfy the PLRA's exhaustion requirement. *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed rubric, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,*

495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendant should be deemed to have forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through the defendant's own actions preventing the plaintiff from exhausting otherwise available remedies, he or she should be estopped from asserting failure to exhaust as a defense. *Id.* In the event the proffered defense survives these first two levels of scrutiny, the court must determine whether the plaintiff has established the existence of special circumstances sufficient "to justify the failure to comply with applicable administrative procedural requirements. [10] , [11] *Id.*

B. *Burden of Proof*
Before applying the foregoing legal principles, I must first consider who bears the burden of proof, and whether that burden shifts throughout the analysis prescribed under *Hemphill.*

As an affirmative defense, *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007), exhaustion is a claim upon which the party asserting it typically bears the ultimate burden of proving its essential elements by a preponderance of the evidence. *Soria v. Girdich,* No. 9:04–CV–727, 2007 WL 4790807, at *2 (N.D.N.Y. Dec. 2007) (DiBianco, M.J.) (citing *McCoy v. Goord,* 255 F.Supp.2d 233, 247 (S.D.N.Y.2003)); *McEachin v. Selsky,* No. 9:04–CV–83(FJS/RFT), 2005 WL 2128851, at *4 (N.D.N.Y. Aug.30, 2005) (Scullin, C.J.) (citing *Howard v. Goord,* No. 98–CV–7471, 1999 WL 1288679, *3 (E.D.N.Y. Dec. 28, 1999)), *aff'd in part, vacated in part,* 225 F. App'x 36 (2d Cir.2007). The issue is somewhat complicated, however, by consideration of the three-part analysis mandated by *Hemphill* and related cases because that line of cases incorporates concepts—such as estoppel, for example— that typically require the party asserting them to bear the ultimate burden of proof. *See e.g., Abbas v. Dixon,* 480 F.3d 636, 642 (2d Cir.2007) ("The plaintiff bears the burden of showing that the action was brought within a reasonable period of time after the facts giving rise to the equitable tolling or equitable estoppel ...."); *In re Heflin,* 464 B.R. 545, 554 (D.Conn.2011) ("The burden of providing every element of an estoppel is upon the party seeking to set up the estoppel.") (citing *Comm'r v. Union Pac. R. R. Co.,* 86 F.2d 637, 640 (2d Cir.1936)).

**\*6** Also complicating matters is the fact that several courts have held that once a defendant satisfies the burden of demonstrating that an inmate has failed to exhaust administrative remedies, it then becomes incumbent upon the plaintiff to counter with a showing of unavailability, estoppel, or special circumstances. *See, e.g., Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *4 and n. 17 (N.D.N.Y. Mar.31, 2010) (Suddaby, J.); *see also Calloway v. Grimshaw,* No. 9:09–CV–1354, 2011 WL 4345299, at *5 and n. 5 (N.D.N.Y. Aug.10, 2011) (Lowe, M.J.) (citing cases); *report and recommendation adopted,* 2011 WL 4345296 (N.D.N.Y. Sep.15, 2011) (McAvoy, S.J.); *Cohn v. KeySpan Corp.,* 713 F.Supp.2d 143, 155 (E.D.N.Y.2010) (finding that, in the employment discrimination context, defendants bear the burden of establishing the affirmative defense of failure to timely exhaust his administrative remedies, but once defendants have done so, the plaintiff must plead and prove facts supporting equitable avoidance of the defense.). Those decisions, while referencing the burden of proof on an affirmative defense, seem to primarily address an inmate's burden of *production,* or of going forward, to show facts that would form the basis for finding of unavailability, estoppel, or a finding of special circumstances, rather than speaking to the ultimate burden of *persuasion.*

I have been unable to uncover any cases squarely holding that the defendant bears the ultimate burden of proof with regard to all elements of a *Hemphill* analysis. In the final analysis, however, *Hemphill* addresses all of the elements a court is required to consider when analyzing an exhaustion defense. *See Macias,* 495 F.3d at 41 ("In *Hemphill* we "read together" [a series of cases] and formulated a three-part *test* ....") (emphasis added). Therefore, I recommend a finding that, while the burden of production may shift to the plaintiff when a court undertakes a *Hemphill* analysis, the ultimate burden of proof with respect to the exhaustion defense remains, at all times, with the defendant. *See Soria,* 2007 WL 4790807, at *2 ("[A]s with other affirmative defenses, the defendant has the burden of proof to show that plaintiff failed to exhaust his administrative remedies.").

C. *Application of Governing Legal Principles*

1. *Availability of Administrative Remedy*
In this instance, the question of whether the ARP was available to Bailey is at the heart of the exhaustion

analysis. The hearing testimony confirmed, and Bailey admitted, that at all times relevant to this litigation, there was an inmate grievance procedure in place at FCI Ray Brook. This, however, does not necessarily mean that it was "available" to the plaintiff.

Bailey contends that the grievance process was not available to him in light of the alleged refusal of prison officials to provide him with the forms necessary to file an ARR and pursue the grievance to culmination. Having considered the competing testimony, however, I conclude that Fortier has established, by a preponderance of the evidence, that the forms necessary to pursue a grievance in accordance with the ARP in place at FCI Ray Brook were available to Bailey through several sources, but were not requested. As such, Fortier has satisfied the first *Hemphill* factor.

### 2. *Presentation of Defense/Estoppel*

**\*7** The focus of the second prong of the *Hemphill* analysis is upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). In her answer, Fortier raised exhaustion as a defense in a timely fashion. *See* Answer (Dkt. No. 22) Second Defense ("Plaintiff carefully failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a)."). Bailey argues, however, that his failure to follow the prescribed grievance process was a direct result of the refusal of prison officials to cooperate in his efforts to grieve the matter.

" 'Generally, a defendant in an action may not be estopped from asserting the affirmative defense of failure to exhaust administrative remedies based on the actions (or inactions) of other individuals.' " *Atkins v. Menard,* No. 9:11–CV–9366, 2012 WL 4026840, at \*3 (N.D.N.Y. Sept.12, 2012) (Suddaby, J.) (citing *Murray,* 2010 WL 1235591, at \*5 and n. 26 (collecting cases)). Put differently, a plaintiff must allege that a defendant named in the lawsuit acted to interfere with his ability to exhaust in order to establish a basis to estop that defendant from invoking the exhaustion defense. *Calloway,* 2011 WL 4345299, at \*4 (citing *Bennett v. James,* 737 F.Supp.2d

219, 226 (S.D.N.Y.2010), *aff'd,* 441 F. App'x 816 (2d Cir.2011)) (other citations omitted).

The question of whether, in this instance, prison officials should be estopped from asserting failure to exhaust as an affirmative defense as a result of their conduct is inextricably intertwined with the question of availability of the remedy. Assuming, however, that this presents a distinct inquiry, the court must examine whether, through her conduct, Fortier has provided a basis to estop her from asserting an exhaustion defense.

In this instance, Bailey does not allege that Fortier engaged in a campaign to preclude him from filing a grievance regarding her actions. Instead, his focus is upon the alleged refusal of other officials at FCI Ray Brook to provide him with necessary forms and cooperate in his efforts to present his grievance against Fortier. Accordingly, Bailey has failed to present any evidence that would support an estoppel against the defendant from raising the issue of exhaustion. *Atkins,* 2012 WL 4026840, at \* 3. Therefore, I conclude that Fortier has proven, by a preponderance of the evidence, that she did not, through her own actions, preclude Bailey from taking advantage of the ARP and therefore should not be estopped from asserting the defense.

### 3. *Special Circumstances*

The third, catchall factor that must be considered under the Second Circuit's prescribed exhaustion rubric centers upon whether special circumstances sufficient to justify excusing the plaintiff's failure to exhaust administrative remedies have been demonstrated. *Hemphill,* 380 F.3d at 689; *see also Giano,* 380 F.3d at 676–77; *Hargrove,* 2007 WL 389003, at \*10. Among the circumstances potentially qualifying as "special" under this prong of the test is where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at \*10 (quoting and citing *Giano* ). Special circumstances may also exist when a facility's "[f]ailure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals-which effectively rendered the grievance process unavailable to him." *Murray,* 2010 WL 1235591, at \*6 (quoting *Sandlin v. Poole,* 488 (W.D.N.Y.2008) (noting that "[s]uch facts support a finding that defendant's are estopped from

relying on exhaustion defense as 'special circumstances' excusing plaintiff's failure to exhaust")).

**\*8** During the evidentiary hearing, Bailey testified to his awareness of the existence of the ARP at FCI Ray Brook. *See, e.g.,* Tr. 102. Bailey's testimony regarding his alleged efforts to secure the forms necessary to pursue the grievance plainly evidences his knowledge of the requirement that he exhaust available administrative remedies, and negates a finding of any reasonable belief on his part that the dispute in issue was not grievable and could not have been presented through the BOP's internal grievance process. Accordingly, again allocating the ultimate burden of proof on the issue of special circumstances to the defendant, I nonetheless conclude that she has demonstrated, by a preponderance of the evidence, the absence of any special circumstances that would serve to excuse plaintiff's failure to exhaust administrative remedies.

## IV. *SUMMARY AND RECOMMENDATION*

The credible testimony and evidence adduced at the recent hearing, held to address the merits of defendant's exhaustion defense, establishes that (1) Bailey failed to avail himself of the BOP grievance process, which was available to him, before commencing this action; (2) Fortier did not, through her actions, preclude Bailey from

filing a grievance regarding the claims set forth in his complaint, or otherwise engage in conduct for which she should be estopped from asserting failure to exhaust as an affirmative defense; and (3) Bailey has offered no special circumstances warranting that he be excused from the PLRA's exhaustion requirement. Accordingly, it is therefore hereby respectfully

RECOMMENDED, that plaintiff's complaint in this action be DISMISSED, based upon his failure to comply with the exhaustion requirements of 42 U.S.C. § 1997e(a).

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette, 984 F.2d 85 (2d Cir.1993)*.

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 6935254

### Footnotes

1   *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

2   The June 20, 2012 Hearing Transcript (Dkt. No. 44) will hereinafter be cited as "Tr. ____".

3   According to Bailey, there were no corrections officers present in his cell unit at the time of the assault. Complaint (Dkt. No. 1) ¶ 13.

4   Plaintiff was aware of the twenty-day limitation for filing a BP–9 form to initiate the formal grievance process. Tr. 103.

5   Here, the record demonstrates that in light of his circumstances, including the fourteen-day period of hospitalization following the incident, Bailey almost certainly would have been granted relief from that requirement had such a request been made. *See* Tr. 43, 144. I note, parenthetically, that the handbook provided to inmates at FCI Ray Brook does not address the possibility of requesting an extension of the twenty-day time limit for filing a BP–9. *See* Tr. 34, 43.

6   Jean Marie Diehl took over as plaintiff's correction counselor in or about September 2009, shortly before Snyder's retirement from the BOP. Tr. 140, 163.

7   During the hearing Bailey testified that he did not recall Darrah visiting him. *See* Tr. 114. Once again, I credit the testimony of Darrah over that of the Bailey with respect to this issue.

8   The hearing was conducted by video conference, with Bailey participating and testifying from the Kentucky federal correctional facility in which he is currently being held, pursuant to Rule 43(a) of the Federal Rules of Civil Procedure. *See Rivera v. Santirocco,* 814 F.2d 859, 862 (2d Cir.1987). At the outset of the hearing I placed upon the record the factors which I considered in declining to exercise my discretion to require that Bailey be produced in person for the evidentiary hearing. *See* Tr. 3.

**9**    Attorney Michael J. Sciotti, Esq., of the firm of Hancock & Estabrook, LLP, was appointed in January 2012 to represent the plaintiff in this action, *pro bono,* at the hearing. The court wishes to express its thanks to Attorney Sciotti and his co-counsel, Robert Thorpe, Esq., for their energetic and diligent efforts on behalf of the plaintiff.

**10**    In *Macias,* which, like this action, involved an Eighth Amendment claim under *Bivens,* as well as claims under the Federal Court Claims Act, 28 U.S.C. § 2671 *et seq.,* defendants asserted that plaintiff's complaint was subject to dismissal under the PLRA based upon his failure to exhaust available administrative remedies. *Macias,* 495 F.3d at 40. Reiterating the importance of exhaustion in both a substantive and a procedural sense, the Second Circuit concluded that, while a prisoner may have substantially exhausted remedies by making informal complaints regarding the conditions at issue, the PLRA, as illuminated by *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368, requires proper procedural exhaustion through the available grievance channels. *Id.* at 41. The court left open, however, the possibility that, notwithstanding the Supreme Court's decision in *Woodford,* a defendant could be precluded from asserting failure to exhaust available administrative remedies in the event of a finding that threats by prison officials may have deterred compliance with the PLRA exhaustion requirements, including under *Hemphill. Id.* at 44–45. The court in *Macias* also noted that the plaintiff in that case did not assert that the available internal remedial scheme was so confusing as to excuse his failure to avail himself of that process, thereby obviating the need for the court to determine what effect, if any, *Woodford* would have upon the *Hemphill* holding to the effect that a reasonable misinterpretation of the available scheme could justify an inmate's failure to follow the procedural rules. *See Amador v. Superintendents of Dep't of Correctional Serv.,* No. 03 CIV. 0650 (KTD/CWG), 2007 WL 4326747, at *6 (S.D.N.Y. Dec.4, 2007). It therefore appears that the teachings of *Hemphill* remain intact, at least with regard to the first two points of inquiry. *Id.* at *7.

**11**    In practicality, these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. *See Hargrove,* 2007 WL 389003, at *8 n. 14; *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

---

**End of Document**                             © 2016 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1**  The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048– 49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se'* s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*

It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

*Conclusion*

For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with

the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Footnotes

1    In light of this finding, there is no need to consider the defendant's qualified immunity argument.

 © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**  © 2016 Thomson Reuters. No claim to original U.S. Government Works.    4